It's so so that's May it please the Court. The government's appeal in this case is about agency discretion. The court below abused its discretion in two ways. First, by denying the motion for voluntary remand and second, by ordering permanent injunctive relief that precluded the agency from pursuing lawful alternatives. The agency conceded in proceedings below that it had made a factual error in its post-award OCI investigation. It sought to correct that error. Specifically, it advised the court that it wished to reinvestigate, ascertain the correct facts, and make a determination based on the correct record. The court denied it this opportunity, instead pressing on to make a determination on the basis of that which remained unknown. This approach is fundamentally inconsistent with how administrative review ought to proceed. Agency's power to reconsider their decisions is well established. The power to reconsider is inherent in the power to decide. Moreover, an agency may properly request a remand. What would you do if we sent it back? Are you going to reinvestigate a third time after you failed the first two? Your Honor, we understand... Are you going to re-mitigate after you failed to mitigate the first two times? Your Honor, the question at this point is not whether we can mitigate now. That's a basic misconception here, is that this is some sort of an attempt to mitigate after the fact. That's not the question here. The question is whether an OCI actually went unmitigated in the first place. The essential question is whether or not... Let's remember the facts. You found on a first investigation that there were four people who may have had access to the wrong information. It turns out those four, as you properly found out, were firewalled and it was fine. It was the 12 you didn't find that had the problem. That's correct, Your Honor. Given all that, please explain to me again what is the value in going back and having you do a third re-mitigation, re-investigation? Your Honor, to be clear, we understand it to be a second investigation, but the value in it is that we would then find out the truth about whether or not this awardee did or didn't obtain an unfair competitive advantage by looking at those 12 people. Is the government conducting this investigation now, although the case is before the court? The government has not attempted to conduct the investigation while these questions are before the court. The government is waiting. The government believes that it should be able to conduct this investigation. The government has admitted error? Absolutely. Absolutely, Your Honor. The government, on no uncertain terms, has admitted that a factual error was made and the record is not correct or complete as it is now. Why isn't the error being corrected? The government understands the ruling that stands right now by the Court of Federal Claims. The government understands it to mean that it should not and cannot go back and do a better investigation at this point. The ruling below was that the proper remedial force at this point is to go all the way back further and set aside all of the proposals, get new proposals, and determine now whether it can be mitigated to pave the way for new proposals. This is not the government's only option. The government has a variety of lawful approaches to addressing this problem, and one of them must be to do a better investigation. There's no reason why that opportunity, that lawful approach, which is concededly available to the agency before the complaint was filed, somehow evaporates once the complaint is filed. If the investigation that the agency did was not sufficient... Does it evaporate because the complaint was filed, or does it evaporate because you failed when you investigated, you failed when you mitigated, and now you're asking for a chance to fail again? Why don't we see the things the way the court does, which is just to say, once you've got a mistake of this magnitude, a major conflict of interest, let's start over. Let's clear the decks. Let's not have tainted air hanging in the room. Let's start over. Because that's a decision for the agency, Your Honor. It's the agency that has to be the decision maker and the fact... Does the agency forfeit that when it fails a couple times? No, Your Honor. Not unless it's theoretically possible that at some point the court could decide that the agency has no discretion to further investigate or to act in any other manner. But unless the court can find that the agency does not have any discretion to act in some other manner, the court must stay its hand and not order the agency to undertake a particular remedial course. The agency waited six months before it even asked for the remand. Is that an indication that the agency is anxious to exercise its discretion and go out and do good as the white knight here? Well, the timing, Your Honor, as we explained in our reply brief, is quite reasonable. So the error was disclosed in March as part of litigation before the Government Accountability Office. GAO continued to consider the case for a few months thereafter and on May 4th denied the protest. Netstar filed another protest approximately a week later on May 11th. Three months later, on August 10th, 2011, the agency notified the court that it was going to reconsider. They wanted to correct the facts, get the record right, and reconsider. Three months is not an unreasonable time period. But even as important as that, the argument— But that's six months after learning of the error. If you learn of the error, wouldn't you immediately leap up and say, oh, I'm sorry, we've made a mistake here. Give this back to us and we'll get it right. That doesn't happen for six months. Not necessarily if you're currently in litigation, Your Honor. You defer to the forum. I don't want to admit error at any point, even if it's your responsibility to mitigate. Oh, I don't think that's true, Your Honor. I think that certainly I wish and I think the government wishes that it had immediately recognized that the right thing to do here on March 3rd or even March 2nd was to say right away, we're going to get the facts right and then we'll do this proceeding if it's still an issue. It didn't happen. And so what's the consequence of that? To show that delay means that a remand motion should be denied, the litigant needs to establish that there's harm from the delay. And so these competing interests of finality versus getting the decision right weighs far more heavily in favor of getting the decision right when the litigant who is opposing the motion to remand is not being harmed. Rather, in this case where NetStar One continues to perform to this day under a sole source bridge contract, it is not being harmed at all by the delay here. It is the agency that has the greatest incentive to get this resolved as soon as possible. But more important than that is getting it resolved correctly. And that's what the agency sought to do here. By reinvestigating the facts, the agency, we would have known whether or not this award was tainted or wasn't. And that was a choice, a method of proceeding that the agency should have been allowed to pursue. After all, the presumptive remedy even where a litigant establishes error under the standards of 706 is a remand. And so denying- Can you put the red lights on, Mr. Folk? I'm sorry, Your Honor. I apologize. Thank you. To the extent I have any remaining time, I would like to reserve. Thank you. Okay. Good morning. May it please the Court, Douglas Patton for the intervener, Elon Belau. I would like to address your comment, Chief Judge Rader. We believe that the lower court made a legal and factual error in finding that there was a significant OCI that had not been properly mitigated. The linchpin of that error was its conclusion that the remedies relied upon by the contracting officer in finding that any potential OCI was properly mitigated were remedies adopted after the fact. So you're not seeking the remand to mitigate, right? Pardon me? You're just seeking a reversal on the merits? That's correct, Your Honor. Now, the contractor officer herself has found three OCIs. She found that there were three potential OCIs. She never found that there was a- I think conflicts of interest are kind of always potential, aren't they? No, Your Honor. Well, this one's explained to me why it's potential, that the mitigation plan seems to have failed. We've got the wrong people firewalled. The people that should be firewalled aren't, and they're the ones who seem to have access to information that compromises this bid. Explain to me how all of that is potential. Because all of the AILON employees under the three prior contracts performed by AILON had to sign, according to ICE procedures, non-disclosure agreements where they promised not to disclose any confidential information they obtained to anyone. In addition, all three contracts required that those employees undergo annual security awareness training where all these procedures, which were in place for all three contracts, were followed. And if you look at the declaration of Ms. Morales at 891, she addresses, appendix 891, these 12 employees who are not originally identified. And she said, while we have four other sources of evidence to show that these employees did not misuse any confidential information, we have evidence that all AILON employees, including them, signed non-disclosure agreements. They also had agency representatives sign a declaration saying that was the standard practice. They also had the information that all employees underwent security training under the ICE employees. In addition, they had the information that none of the AILON... Were the non-disclosure agreements faulty in any respect? No, Your Honor. We do not believe they were faulty. The court points out that they were not dated. There is no block for a date to be put in, but there's no dispute in the record that standard practice that they had to be executed. Was there any appearance that those may have even been obtained after the bid protest began? No, Your Honor. What happened was that there were email traffics where the government, after the protest, asked AILON if they had copies. This is a contracting officer's statement. Did she obtain and did the record contain sworn statements of these 12 employees that they had no access to the labor board? No, she did not obtain them. And what the contracting officer's technical representative, Ms. Morales, did at 891 is conclude that there was still no evidence of an unfair competitive advantage because there's not an ounce of information in this record. But under your firewall procedures, you still don't know who has access to what information, do you? Absolutely correct. And that's consistent with the ICE procedures, which require that the employees not to disclose to anyone what data they've been given access to. That's entirely consistent and rational. And what you have here... How can you monitor improper disclosures? Well, first of all, they have a procedure within ICE that we quoted in our brief that requires any breach of those procedures has to be disclosed immediately to the ICE representative. So if any accidental or intentional misuse of that information has to be disclosed. Then how come we only knew that we had a... In your initial investigation, you put forth four people and we found out, of course, they weren't relevant at all. It was the 12 people you didn't give us that were relevant. Well, Your Honor, there were four that we believe were relevant, but there were other parts of the database, which ICE did determine had additional ALON employees working on. But that's natural. These databases are huge. Mr. Patton, I haven't heard much reference to the opinion of the Court of Federal Claims, which is one of the strongest opinions that I've read based on the perceptions and understanding of the trial court judge. He says there are hard facts here that strongly suggest the existence of an OCI. There's little doubt that the potential conflict was significant. Also, it's a strong language here. This is unacceptable. The CO never enforced these provisions. This is a very powerful opinion. You're correct, Your Honor. And we believe those statements do not follow this court's precedent that you have to have for hard facts to establish a significant OCI, which is substantial unfair competitive advantage. Under these three contracts, ICE- How can we overrule the trial judge who found that there were hard facts? Well, because they're not supported by the record. The linchpin of his decision is that all of these procedures were adopted after the fact. That is factually flat-out wrong in this record. That is a flat-out factual error. That is the linchpin, if you go to his decision, of saying there is no potential way to resolve these because they were after the fact. We pointed out in the record, and the CO's determination, and our letter responding to the OCI letter said, here are all these procedures that existed during these three contracts. They were not adopted after the fact. There's no factual dispute about that. There's not a single fact in the record that a single ALON employee ever disclosed any improperly obtained confidential information. But the CO found that there were significant OCI's. The trial court is just affirming the CO. That is wrong, your honor. If you go to the CO's- Well, I'll tell you what. You see that little red light? Yes, sir. Thank you. Let's hear from Mr. Savarino. We'll give Mr. Savarino an extra two minutes, and then we can have a rebuttal from Mr. Volk. May it please the court, I'm Bill Savarino on behalf of NETSTAR. You're struggling with Mr. Patton's arguments because the problem in this case is FAR 9.5. This trial judge found a violation of FAR 9.5. FAR 9.5 is the linchpin of this case. We can talk about all the mitigation efforts. We can look what the CO did and didn't do. But 9.5 mandated that this CO take precaution and investigate these matters prior to award and to deal with these OCI's prior to award. This trial judge was sensitive to 9.5 because he's bound to follow the law. 9.5 says that the CO had to take a look at all these OCI's well before the contract award. This case is very unusual because you are confronted with a significant OCI that is admitted by the government. It's not a potential OCI. It's not an OCI based on suspicion or innuendo. The CO found actual significant OCI's. And as Chief Judge Rader suggested, the trial judge confirmed that. You've got a situation where these OCI's, significant OCI's were found after award per say violation of 9.5. How are you supposed to fix that? The government and Mr. Patton would suggest that you can fix this with some band-aids called declarations after the fact. But nobody can go back and fix the problem that the violation of 9.5 created because 9.5 was put in place to say you shouldn't even be at this point in the process. You've got to fix this prior to award. That's what this whole case is really all about and I think that's what really bothered Judge Allegra. He saw some other evidence in the record that you can take a look at as well to suggest that there was complete abdication of any responsibility by the government until finally called upon to take action. I wanted to just put some context to this case a little bit for you. An important distinction in this case, and I'm going to reiterate it again because it is one of the other cases that may be out there with respect to these OCI's, is that this was an actual significant OCI. No doubt. It is a fact. It was found by the contracting officer. It was then reiterated. It was found to be potential, however. Judge, let me refer you to joint exhibit 798. This is the letter that the CEO sent to AILON in December of 2010. I'll just read it to you. You can pull it up when you need to. After completing the re-evaluation process, the contracting officer has concluded that OCI's do exist. Not potential OCI's, actual OCI's exist. And just to, well, I'll give you time to take a look at it. It's at the bottom of the letter, Judge. Please, go ahead. Well, I think what's important to note here is that there's no dispute that AILON's employees had access to Netstar's fully loaded labor rates. There's no dispute. And there's no dispute that that access was significant. Because those labor rates were the differentiator in the price evaluation for the government, which was the basis for the award to AILON. AILON did not have a technical score that is equivalent to Netstar's. It won because it had lower prices. It beat Netstar's fully loaded labor rates. So we have access to those rates. We have those rates being significant in the award decision. There's no question that this access to those rates was a significant OCI. It's also significant to know that the government completely failed to consider 9.5 and the restrictions and considerations that you have to follow under 9.5. It's not disputed. Government acknowledges. Government says, send it back. We made mistakes. Let us do it right. How do you fix that, Judge? You know, I've looked at that argument. And I'm saying, well, how do you fix a 9.5 violation? If 9.5 says you were supposed to do all this prior to award because if you don't, you're going to taint the process. How do you fix that after the fact? And I think that's what Judge Allegra said. He said, I've got to send this back to the beginning. I can't. Once they have the knowledge. Put the genie back in the bottle and you've, you know, patent that. You'll be a multibillionaire. You can't put the genie back in the bottle. And that's why 9.5. We don't want to get into whether you can patent a business. After that last case, I understand fully and completely. So I think that you've got to really put this case into the context of the violations that occurred. It just wasn't arbitrary and capricious. It was a violation of regulation that Judge found. And it's clear that it was a violation. With respect to this, what I'll call a... that any prejudicial information was ever attributed to any Al-An employee or that there's no direct evidence that this bid was compromised. What's your response to that? Well, he absolutely has to say that because that's the only defense they have to this. But that's not what the law says. Take a look at Turner. This court decided that you don't need to have hard facts showing prejudice. All you have to do is show hard facts establishing that an OCI existed. And that has already been admitted by the agency. So in this particular case, the prejudice is presumed, not the OCI. OCI has already been admitted by the government and it's clear. So you don't have to... there doesn't have to be any proof by anybody of an actual violation. As this court said in Turner, there's no way you could monitor that. Because under an APA standard, you'll never know what these people are thinking. Now, Mr. Volk says to us, this is the government's call. The government should have an opportunity to do its job and the court's taken that opportunity away from the government and kind of stepped into its place. That has a bit of an impact as an argument. How do you respond to that? That's another argument they have to make as well because they have no defense to this. The remand in a 9.5 violation does nothing to fix 9.5. If you remand it back to the agency and say, stir some peas on the plate and figure out some stuff, you can't go back and put that genie back in the bottle. It's out there. You can put some affidavits together. You could do... you can maybe put some purported firewalls together. But that's a prospective remedy. The problem with this case is 9.5 says you have to do this prior to award. The government isn't really required in every instance to fix it. 9.5 also says they can waive a OCI if they perceive it's not prejudicial. Certainly can, Judge. So shouldn't they receive an opportunity to take a look and see if that's their course? Well, no. And I'll tell you why. You're relying on 9.5. You have to stick with all of its provisions. Certainly. And yes, a waiver is a possibility for the government. But at what point? And by whom and when? And are we speculating as to what the government's going to do? We have a record upon which a judge made a decision and a waiver is not part of that. The government, as you indicated, knew that there was a problem with the affidavit. There was a problem with an OCI a long time ago. If they wanted to effect a waiver, they had every opportunity to do so. Now the record is complete and the judgment has been rendered on that record and they have to live with that record. They can't come back at this late date now and say, you know what? Let me take it all back. I'm sorry. Let's just, sorry we put you through all the litigation. Let me go back. We're going to put a waiver in place. And the record does not permit them to do that because the judge didn't have anything before him at that time in making the decision. In fact, he prodded. If you take a look at the oral arguments, he really wanted to know. I'm going to put this injunction in place, people. What do you want? Give me some information here. What are you going to do? I'm going to, you know, pin the ears back on the government here. What do you want me to do? And there really wasn't any substantive response from the government. Government decided to take the risk on the decision in their living body. And I would also add, Judge, you just don't put a waiver in place. I mean, you have to, this regulation says it's got to be at a very high level. It's got to be approved by a very high level. And I'm going to argue because if the argument from the government is we could or should or would or maybe, I'm going to say the reason they didn't do that is because nobody at that government would put their, nobody at that agency would put their signature on a waiver with these kinds of facts in the record. Simple as that. Because this record is atrocious when it comes to this particular OCI. You will hear, if you haven't already, some legal prognosticators talking about this case. And they refer to this case as the recipe for how not to deal with an OCI. And if you take a look at Judge Allegra's decision, you'll realize the agency did everything wrong in this particular case. It wasn't, this is not a case where the agency tried to comply with the regulations. It tried to do its best effort. It did nothing. It let the OCI exist during the course of the procurement, which 9.5 says is taboo. It put Netstar's information in jeopardy. It tainted the entire procurement. And then they come back and they suggest, don't put a remedy in place. We'll take care of it for you. That doesn't fly under the APA. That's our position on that. So what I wanted to do is just briefly touch on the remedy, because I know the remedy was an issue that was raised by the government in its brief. You know, remand is not a presumptive remedy in this particular case. Under the Tucker Act, the Court of Federal Claims judges have broad discretion in deciding what remedy that they should emplace. This court said in Turner, clearly, if a significant OCI goes unmitigated during the course of a procurement, serious remedial actions are appropriate. That's what Judge Allegra saw. That's what Judge Allegra put in place. He said we cannot allow some post hoc rationalization to fix this violation that tainted the entire procurement, start from scratch. Did not kick Ailan out. Would have liked to have seen that. Would have liked the judge to have said, Ailan has no play in this procurement whatsoever. You cannot award Ailan. What Judge Allegra said is you can't award on those proposals. He gave the agency the discretion, if they want, to go back and do it right. Ailan can still play. So the remedy is not as broad as the government would argue. He just put it right back at the beginning and say, do it right. If you want to award to Ailan, you can do that. But you've got to do it right under 9.5 of the FAR. And if you do it right, God bless you. But you've got to do it right. The way I read the injunction is Ailan is hereby enjoined from performing on the contract. On the contract. He vitiated the contract. But not on some future contract in this procurement. Even though they have the information. Well, I may have something to say about that. But the agency has the discretion, if it chooses, to go back and do it the right way and make sure prospectively, during the course of this procurement, the integrity of their procurement is preserved. And that's what 9.5 says. 9.5 says you don't absolutely have to eliminate all OCIs. You've just got to make sure it's not going to take this procurement. I have nothing further at this point unless you have some questions. Thank you. Thank you. Chavarino, Mr. Volk, you have two minutes. Counsel, excuse me. Counsel for NETSTAR 1 represented multiple times the government has admitted the OCI that's not true. The government has not admitted that there is an OCI. An OCI, in this case, means that there is a substantial unfair competitive advantage has been obtained. That is the ultimate question. And that's the question that the agency wants to go back and get right. The investigation that the agency did may not have cleared the air of OCI tank. But it certainly did not yield facts that established that AILON actually did obtain a competitive advantage. But if AILON had information concerning employee costs, and that's built into a bid, why isn't that ipso facto material in the bidding process? Because, Your Honor, it all depends on who at AILON. Certain AILON employees were there with potentially with access to that information as they should have had it. Other employees of AILON were off preparing the solicit, the response to this RFQ. And the indication in the record was, from those who were asked, that they didn't correspond with one another. But the claim, the entire, NETSTAR's entire case is built on what we do not know. The agency is not required to assume that bad things happen just because they couldn't have. The agency has the opportunity to take that approach if it wants. But it cannot be forced to assume that these things happen. The agency must retain the right to get the facts right and make a decision for itself based on the correct facts. And for these reasons, we respectfully request that the court reverse the lower court's decision to deny the motion to remand and the court's decision regarding permanent injunctive relief. Thank you, Your Honor. Thank you, Mr.